CLEAVER–BROOKS MFG. CORPORA-TION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 12429.

United States Court of Appeals Seventh Circuit.

March 17, 1959.

**638**

Victor M. Harding, Milwaukee, Wis., for petitioner.

Thomas J. McDermott, Associate General Counsel, Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C., Jerome D. Fenton, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, James A. Flynn, Attorneys, National Labor Relations Board, Washington, D. C., for respondent.

Before SCHNACKENBERG, PARKINSON, and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

Cleaver-Brooks Manufacturing Corporation (hereinafter called the "Company") seeks to set aside an order of the National Labor Relations Board (hereinafter called the "Board") to reinstate Claire A. Houk, Thomas Zivkovich, Carl J. Holston, and Carl R. Olson, discharged employees with back pay; to withdraw recognition from Employees Independent Union of Cleaver-Brooks (hereinafter called the "Independent") as the collective bargaining representative of its employees pending certification of a representative; and to post certain notices. In its answer the Board has prayed enforcement of its order.

This Court acquires jurisdiction under the National Labor Relations Act, as amended (29 U.S.C.A. § 151 et seq.) Sec. 160, subsections (e) and (f).[1]

---

1. § 160. "Prevention of unfair labor practices
   *    *    *    *    *
   "Petition to court for enforcement of order; proceedings; review of judgment
   "(e) The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restrain-

ing order, and shall file in the court the record in the proceedings, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the

The facts are largely undisputed.

The Company, a wholly-owned subsidiary of another Wisconsin corporation, Cleaver-Brooks Company, operates a plant in Waukesha, Wisconsin, where it manufactures water distilling units, special products, and tooling for its parent corporation at Milwaukee, whose works manager, Glenn W. Leupold, also exercised management control of the Company.

In May, 1956, Leupold found that the welders employed in the Waukesha plant lacked proper supervision and control with respect to assignment of work and loitering on the job. The welding foreman from the Milwaukee plant, after a week's inspection visit, reported that the welders were actually working an average of approximately two and one-half hours per 8-hour day. One of the difficulties arose in connection with leadman, Claire Houk, who admittedly regarded himself as an overseer rather than a production worker, although the works manager wanted him to work alongside the other welders and not to direct their activities, except when instructed to do so by the foreman.

During the spring and summer of 1956, the Company's workload had been augmented by two sizable Government contracts which were nearing completion. The number of hourly paid employees in the plant declined from a minimum of 80 in June and July, to a minimum of 47 in October. In November employees were stabilized at approximately 47 in number.

Effective October 10, 1956, Foreman Schwager was relieved of his jurisdiction over the welders. The new fore-

---

failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of Title 28.

"Review of final order of Board on petition to court

"(f) Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive. As amended Aug. 28, 1958, Pub.L 85-791, § 13, 72 Stat. 945."

man was Frank Unold, who had been and continued as foreman of the Assembly department. Announcement of the change of foreman met with opposition.

Schwager testified that Carl R. Olson threw down his tools, and, using very intemperate language, said he would never work for the new foreman. All 15 welders left their place of work. There was a work stoppage of about 20 to 25 minutes. Schwager testified that Carl Holston and Thomas Zivkovich said they wouldn't work for the new foreman. Chester Tambert, production manager, promised to arrange a conference with the works manager, and the men all returned to work. Zivkovich, on cross examination, testified that he and Olson undertook to see Schwager to tell him they decided not to have Unold as their foreman, and to arrange a protest meeting with management.

At the meeting, after discussing the matter, Leupold declined to reconsider his appointment of Unold as foreman. Leupold testified regarding a later interview with Houk alone, at which Houk exhibited a "general attitude and indifference" toward the new foreman which convinced Leupold he would never accept or try to get along with Unold.

Following the protest meeting Leupold discussed the situation with the Vice President and decided to discharge Houk, Zivkovich, Holston and Olson. Tambert testified that he told all four that their attempt "to intimidate. and influence management in selection of their supervisory personnel * * * left a bad taste in the Company's mouth * * *" and that none of the men protested the termination of their employment. He also testified to marked improvement in efficiency under the new foreman. Tambert and Leupold testified that decrease in volume of business made reduction in work force necessary; that these particular four men were discharged because they had shown that they would never accept any foreman placed over them. No new employees were hired to replace them.

The Board found that the Company discharged the four for engaging in a concerted activity for mutual aid and protection in protesting the appointment of a new foreman, a protected activity under Sec. 7 of the Act; that these were discriminating discharges, tending to discourage employees in the exercise of their rights in violation of Secs. 8(a) (1) and 8(a) (3).

The Board concluded that, in any event, notwithstanding the temporary work stoppage and use of intemperate language, the welders had all returned to work and that the Company had failed to assert any right (if any existed) to discharge employees for misconduct.

■ The evidence, however, clearly showed that the Company, faced with the necessity of laying off welders for lack of work, singled out those who had shown unwillingness to accept the new foreman. The fact that the four and other employees also participated in a protest meeting does not of itself bring the concerted activity within the scope of Sec. 7.

■ The Act does not protect activities during working hours which disturb the efficient operation of the Company's business. Caterpillar Tractor Co. v. N. L. R. B., 7 Cir., 1956, 230 F.2d 357.

The Board takes the position that protest over the appointment of a foreman is a concerted activity protected by the Act, citing as authority our ruling in N. L. R. B. v. Phoenix Mutual Life Insurance Co., 7 Cir., 1948, 167 F.2d 983, 6 A.L.R.2d 408, certiorari denied 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395.

The Phoenix case is easily distinguished from the case before us. There no work stoppage, intemperate language, or refusal to accept supervision was involved. Several insurance salesmen were discharged for becoming involved, apparently on their own time, in drafting a letter, proposed to be submitted on behalf of all salesmen, recommending the assistant cashier to fill the vacant post of cashier. The four men discharged

here adopted no such moderate conduct in making known to management their views on, not a vacancy, but an appointment already made, in which the Board contends they had a legitimate interest.

The Board, on the other hand, sees a distinction between this case and N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 1947, 162 F.2d 680 and Fontaine Converting Works, Inc., 77 N.L.R. B. 1386 (1948) wherein employees who struck in protest over demotion of a foreman were held not protected by the Act. We cannot agree. Otherwise, on the facts of this case, one would have to argue that it was in the employees' legitimate interest to maintain the inefficient and inadequate supervision previously provided. The evidence showed a mere personal antipathy to Unold, whose experience and qualifications were not demonstrably inferior to those of Schwager and Houk. It is conceded that appointment of the foreman was not a bargainable issue. The Board's conclusion that the four were discharged as spokesmen is not supported by the Trial Examiners' findings of fact.

We find no merit in the contention that delay in notification of discharge for some two days' time resulted in "condonation" of misconduct. The Company was obliged of necessity to cut its work force. The choice of personnel to be discharged was made after consultation and consideration. The mere fact that all fifteen welders returned to work did not automatically eradicate relative attitudes of cooperation or insubordination among them.

The Company was also charged with premature recognition of the Independent; the Board found that the Company on January 16, 1957, rejected request for recognition from United Steelworkers of America (hereinafter called the "Steelworkers") whereupon the latter filed a petition with the Board for certification. Notice of hearing to determine representation was issued.

On January 21st, the Independent was formed. It also filed a petition with the Board.

After the International Association of Machinists had lost a Board conducted election on February 4, 1955, a Health and Welfare Committee had been formed in the Company, which as early as December, 1956, discussed a possible independent union. The Committee employed legal counsel, who drew up a proposed charter. The Board stresses the fact that the Committee engaged counsel recommended by Leupold. There was no evidence to show the counsel was connected in any way with the Company. At least one witness testified that Leupold did not suggest his name. A meeting was called for the evening of January 21, 1957, off the premises of the Company.

The same day Houk, Zivkovich, Holston and Olson (all members of Steelworkers) filed charges under Sec. 8(a) (1) and (3) discussed above, and, pursuant to established Board practice, the representation hearing was postponed.

At the meeting, the proposed charter was adopted by a vote of 27 to 17. Holston and Zivkovich, present and voting, (although no longer employees) urged affiliation with Steelworkers. They then left the meeting to return shortly with representatives of Steelworkers and the Machinists Union (voted out earlier) who criticized formation of an independent union. One of them attempted to destroy the charter document. A scuffle ensued and the police were sent for. After the visitors left, about thirty-five employees signed the charter as charter members.

On February 2, 1957, counsel for the Independent wrote the Company regarding negotiation of a collective bargaining agreement. The Board contends that the Independent did not show the Company authorization cards or other proof of its majority. The Company, however, knew of the charter. Leupold testified that a number of employees (naming them) had told him about the January 21st meeting.

On or before February 15, 1957, the Company recognized the Independent and entered into negotiations culminating in an agreement effective April 2, 1957.

The Board concluded that this assistance and support to Independent interfered with the employees' free choice of a bargaining representative in violation of Sec. 8(a) (1) and (3).

 Both the Company and the Board agree that the employer's role is to withhold recognition while a question of representation exists, until an election has been held and one union is certified by the Board.

However, the Company argues that when one union has clearly demonstrated its majority, the Act itself imposes on the Company the duty to award recognition to the representative clearly chosen by its employees. N. L. R. B. v. Indianapolis Newspapers, Inc., 7 Cir., 1954, 210 F.2d 501.

Signatures of thirty-five out of a possible forty-seven employees indicates such a clear showing of majority representation.

The Board suggests that the Company has, in effect, observed the ebb and flow of fluctuating sentiment and made timely recognition of the favored union. The facts contradict such finding here. The Company postponed negotiation until pressed by the Independent whose membership, as represented by signatures to the charter, showed Steelworkers to be no genuine contender.

This cause was heard and considered solely on the transcript of record certified by the Board, including the stenographic transcript of the testimony, without reference to the narrative statement which the Board has moved to strike. The Board's motion was based on N. L. R. B. v. Foote Bros. Gear & Machine Corp., 1940, 311 U.S. 620, 61 S.Ct. 318, 85 L.Ed. 394, which reversed this Court's judgment because the petition was based on a narrative statement of evidence.

The Board's motion for reconsideration of its motion to strike the Company's aforesaid narrative statement of the facts is granted, and the first sixty-seven pages of the Company's Appendix is accordingly ordered stricken from the record. No further printed record is ordered.

We conclude that the Board's findings are not substantially supported. We find that the Order of the Board is erroneous and must be set aside.