NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

NEW ENGLAND WEB, INC., et al.,
Respondents.

No. 5988.

United States Court of Appeals
First Circuit.

Heard Oct. 4, 1962.

Decided Nov. 13, 1962.

Nancy M. Sherman, Washington, D. C., Atty., N.L.R.B., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and James C. Paras, Atty., N.L.R.B., Washington, D. C., were on brief, for petitioner.

Owen P. Reid, Providence, R. I., with whom Robert J. McGarry and Graham, Reid, Ewing & Stapleton, Providence, R. I., were on brief, for respondents.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order issued against respondents, charging certain violations of the National Labor Relations Act as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.).

The respondents, all Rhode Island corporations, include: New England Web, Inc.; National Webbing, Inc.; Tri-Dye Corporation; the Conrad Manufacturing Company and Jarvis Manufacturing Corporation. The alleged violations of

the Act stem exclusively from the activities of New England Web, Inc. The other above-named corporations are included in the present proceedings because of the Board's determination that all of the respondents constitute a single employer within the meaning of the Act, and consequently, all are jointly responsible for New England Web's alleged unfair labor practices.

The Board found that New England Web violated Section 8(a) (1) of the Act by interrogating its employees about their union activity and by threatening them with reprisals for engaging therein. The Board also found that New England Web violated Section 8(a) (3) (5) and (1) of the Act by shutting down its plant, and subsequently proceeding to liquidate its operations, to avoid bargaining with the Union.

In making these determinations the Board overruled the findings of the Trial Examiner who, in issuing his Intermediate Report, found that New England Web had not engaged in the above cited unfair labor practices and recommended that the complaint be dismissed in its entirety. The Trial Examiner also found that the five respondents should not be regarded as a single employer within the meaning of the Act.

The facts giving rise to the alleged violations were substantially as follows. New England Web is a small corporation located in Pawtucket, Rhode Island. It engaged in the manufacture of webbing, employing some thirty-five people, of whom approximately fifteen were weavers. The record indicates that in September 1959 New England Web began to receive an unusually large number of returns of defective merchandise from its customers. Because of this fact the company lost several customers. In the judgment of Clarence W. Jarvis, an officer and director of New England Web, the high rate of defective material which was being turned out could be traced to the fact that the weavers were paid on a "piece-work" basis rather than on an hourly basis and that, consequently, these workers were more interested in speed

than in quality of production. When the situation continued Jarvis decided to place the weavers on a basic hourly rate rather than on piece-work rates.

On March 8, 1960 Jarvis summoned the weavers who worked on the first shift (the weavers worked on three shifts) into his office and told them that in an attempt to remedy the quality situation he was going to take all of the weavers off piece-work and pay them by the hour. At this meeting Jarvis explained to the weavers that the work had reached a point where some customers now refused to take any goods that were manufactured by New England Web. Moreover, in order to establish the *bona fides* of the change in method of compensation, Jarvis' uncontradicted testimony was as follows:

"* * * I showed them the books of the company; I showed them our performance for the month of February, that was atrocious; I showed them letters; I showed them returns of merchandise for credit. I even went so far as to show them some tax returns, to show them that this was not a sham deal and I was telling them nothing but the truth, and not anything I wanted to tell them; we just keep one set of books; I don't want any inference that this is a put-up job. I showed them all the records from the very beginning.

"Q. (By Mr. Reid) Now, Mr. Jarvis, did you have the record books of the corporation before you, did you have them with you? A. Yes, I did.

"Q. Were they available to the employees—A. Yes, they were.

"Q. —at the time? A. They were."

On the following morning, none of the weavers appeared for work because of their apparent dissatisfaction with the suggested new method of compensation. However, a group of them met with Jarvis at the plant and asked him to increase the proposed hourly rate. When Jarvis declined, all of the weavers left the

plant. Shortly thereafter they reconvened at a nearby cafe called "The Idle Hour" and decided to call in the Union [1] to represent them.

That day, March 9, one Sylvia—a representative of the Union—called Jarvis to request recognition of the Union and stated that he had dispatched a letter to Jarvis to that effect. Jarvis replied that the matter was in the hands of his attorney. On the same date Sylvia sent the letter to New England Web, stating that the Union represented a majority of its employees and requesting a conference to negotiate a contract. Sylvia also wrote to the Rhode Island State Labor Relations Board petitioning for a representation election. Later on that same day the weavers set up a picket line outside the company plant.

There followed several informal conversations and conferences between representatives of the company and the Union. The company questioned the majority status of the Union, declined a card check and raised an eligibility issue by disputing the appropriate bargaining unit. The State Board then directed an election among the employees, including the strikers. On April 1 the State Board held an election which the Union won and the Union was subsequently certified on April 8.

The first negotiation meeting between New England Web and the Union was held on April 5. Jarvis advised the Union that New England Web had lost its biggest customer, as well as several others; that it would not be able to get these customers back; and that, therefore, New England Web was going to liquidate. Jarvis informed the Union that the company wanted six weavers of its own selection (two for each shift) for the purpose of "running out" the beams that were already in the machines. The company estimated that this work would take from four to six weeks and that the plant would then be closed down.

The next negotiation meeting was held on April 7. Jarvis offered a rate of pay for employees to run out the work and the parties agreed that the six workers who would be needed would be called according to seniority. On the following day, at the employees' request, the Union advised Jarvis that the employees "were willing to go back to work," and that the employees "wanted some assurance that the company would make an attempt to continue in operation." Jarvis again reiterated his decision to close and indicated that there was no sense in making any statement.

On April 14 a Union representative, on behalf of the Union, and each individual employee on strike, sent separate letters to New England Web informing it that the strike was terminated and requesting reinstatement. On the same day a group of strikers went to the company and personally requested reinstatement.

The company's decision remained unchanged and finally the company and the Union agreed to the terms for running out the remaining work. A number of workers, selected according to seniority, undertook to run out the work with the Union's consent.

On May 11, a Union representative called the company's attorney concerning the negotiation of a contract and at the same time advised him that the Union was filing unfair labor practice charges against the company. In view of the Union's action in filing the charges, the attorney questioned the utility of meeting for a contract. Nonetheless, a meeting was held on May 11 and despite the company's reavowal of its intention to close, it requested that the Union submit a written contract for consideration.

A subsequent meeting was held on May 17. Here the discussion centered on the alleged unfair labor practices. However, at the Union's request, the parties did discuss the Union's proposed contract. While no definite agreements were reached, New England Web indicated that if it was going to sign a contract it would only be for the duration of the time that New England Web remained

[1]. Rhode Island State Joint Board, Textile Workers Union of America, AFL–CIO.

in business—a time then estimated to be about two weeks. No further meetings were held after this date.

From March 9—the day that the weavers went out on strike—until the Monday following the Union's election, April 1, New England Web remained in operation; doing business on a restricted basis with workers from other divisions filling in on the weavers' machines. The plant was closed one week from April 4 to April 11 and thereafter resumed to conclude the "running out" operation.

As we have noted, the Trial Examiner recommended dismissal of the entire complaint. The Trial Examiner, after resolving credibility in favor of the company's witnesses, found no illicit threats or interrogation in violation of Section 8(a) (1). He dismissed the Section 8 (a) (3) allegation on finding that New England Web's shutdown was dictated by economic motives and was free of anti-union motivation. The Section 8(a) (5) allegation was dismissed because the Trial Examiner found no refusal to bargain before the election, no discriminatory animus in the liquidation, and bargaining in good faith as to the running out of the work.

The Board's reversal of the Trial Examiner raises two basic issues: (1) Is there substantial evidence on the record considered as a whole that New England Web interrogated its employees and threatened reprisals because of their union activity and (2) was the shutdown of the New England Web plant actuated by legitimate business considerations or was it an artifice to avoid obligations under the Act.

As to the first issue, the Board adopts a view of the Trial Examiner's treatment of the testimony concerning the alleged threats and reprisals with which we do not agree. The Trial Examiner wrote an extremely comprehensive report covering some forty-three pages of the printed record. In his report, *inter alia,* he set forth with particularity all the evidence which was relied on to establish the Section 8(a) (1) violations. He

analyzed the body of this evidence and resolved credibility in favor of the respondents' witnesses. In making these credibility determinations he treated certain witnesses and allegations with greater specificity than others in enumerating the basis and rationalization for his ultimate credibility determinations.

The Board, however, takes the view that because the Trial Examiner did not set forth an in-depth rationalization as to each of the witnesses that he did not "consider" their testimony. As to this portion of the evidence the Board reasoned that "the Trial Examiner merely set out but failed to consider [the testimony]."

We find no basis in this record that the Trial Examiner failed to consider any piece of evidence. Rather, in resolving the question in favor of the company's witnesses he stated that he believed that in many respects their memory was far better "than that of *certain witnesses including* Lisi, Welch and Cirillo [Union witnesses]." (Emphasis supplied). He went on to point out that "these witnesses *particularly* did not impress" him for reasons which he proceeded to enumerate.

It is plainly obvious that the Trial Examiner's allusion to the testimony of the enumerated witnesses, Lisi, Welch and Cirillo, was not meant to be exhaustive but illustrative. The tone of his language calls for no invocation of the canon of construction that *Inclusio Unius Est Exclusio Alterius,* as the Board seems to have believed.

Some of the testimony which the Board relied on to overturn the Trial Examiner was of the precise ilk on which the latter had made specific credibility findings in favor of the company. Another portion which the Board found to substantiate the charge had, on cross examination, actually received "its own death wound." National Labor Relations Board v. Pittsburgh, S.S. Co., 337 U.S. 656, 660, 69 S.Ct. 1283, 1285, 93 L.Ed. 1602 (1949).

■ In short; the Trial Examiner's report—his analysis of the evidence and his citation of the relevant cases—showed an acute awareness of the principles which govern the conduct proscribed by Section 8(a) (1) of the Act. On this record we are unwilling to upset his determinations of credibility either directly or by the more circuitous method of speculating that portions of the evidence detailed with particularity were "merely set out" but not "consider [ed]." As the Supreme Court has so recently reminded us:

"But the Examiner—* * * sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records. As we said in the Universal Camera case [340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456]:

"'* * * The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.' 340 U.S., at 496 [71 S.Ct. at 469].

"For the demeanor of a witness

"'* * * may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance, or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.' Dyer v. MacDougall [2 Cir.], 201 F.2d 265, 269."

National Labor Relations Board v. Walton Mfg. Co., 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962).

We turn then to the second aspect of the case—the question of whether substantial evidence on the record considered as a whole supports the Board's finding that a purpose of the New England Web shutdown and liquidation was to avoid the duty to bargain with the Union.

■ Here again the Board disagreed with the findings of the Trial Examiner. After an exhaustive review of the evidence bearing on this issue, the Trial Examiner concluded that "the General Counsel has failed to establish by a preponderance of the evidence that the Respondent, New England Web, or any one of the other Respondent Corporations, failed to bargain collectively in good faith with the Union." The Trial Examiner found that New England Web's contention that the shutdown was actuated by economic motives was bona fide. In rejecting the General Counsel's argument that the circumstances showed union animus and hostility, the Trial Examiner concluded that "Too much surmise and inference as to employer motivation is necessary in order to warrant a finding of bad faith." Again, we believe that the Trial Examiner's findings are both factually and legally correct and that the Board's conclusions to the contrary are not supported by substantial evidence on the record considered as a whole.

■ We start with the proposition that a businessman still retains the untrammeled prerogative to close his enterprise when in the exercise of a legitimate and justified business judgment he concludes that such a step is either economically desirable or economically necessary. This prerogative exists quite apart from whether or not there is a union on the scene. "A company may suspend its operations * * * so long as its change in operations is not motivated by the illegal intention to avoid its obligations under the National Labor Relations Act. A change in operations motivated by financial or economic reasons is not an unfair labor practice under the Act." N. L. R. B. v. Lassing, 284 F. 2d 781, 783 (6th Cir., 1960), cert. den., 366 U.S. 909, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961). An ordinary act of business management cannot be set aside by the Board. National Labor Relations Bd. v.

Houston Chronicle Pub. Co., 211 F.2d 848, 855 (5th Cir., 1954).

In determining whether the shutdown was justified, we first note that there is nothing in the record indicating a prior history of Union opposition or hostility on the part of New England Web. The presence or absence of this factor is always relevant in questions of this nature. See N. L. R. B. v. Lassing, supra; cf. N. L. R. B. v. Corning Glass Works, 293 F.2d 784 (1st Cir., 1961); and N. L. R. B. v. R. C. Mahon Company, 269 F.2d 44, 47 (6th Cir., 1959).

Assuredly among those factors which would induce a "legitimate" business judgment to close operations, few can exceed financial distress. Here the record indicates that due to the production of defective merchandise, New England Web had experienced serious customer dissatisfaction—resulting in the loss of customers and a consequent and predictable loss in revenues. At the March 8, 1960 meeting with the weavers—even before the advent of the Union—Jarvis showed the workers the books of the company and the tax returns to indicate the seriousness of this situation.

Moreover, at the hearing before the Trial Examiner Jarvis testified at length on cross examination by the General Counsel as to the financial condition of New England Web. He testified that the company had lost $8,000 in February 1960, and was approaching the point where it could scarcely meet its current obligations as they fell due. He further testified that New England Web had obtained a chattel mortgage which required a payment of from $1400 to $1500 per month. Because of the precariousness of its cash position, New England Web was forced to sell two of its "covering machines" in order to realize sufficient funds to keep abreast of its monthly payments. Accounts receivable were approximately $3,000 to $3,500 while accounts payable were between $8,000 and $9,000. In reply to a question from General Counsel as to whether New England Web was solvent—Jarvis replied that the answer to this question would turn upon the amount of money that could be realized upon the sale of the looms in liquidation. Jarvis expressed the hope that the looms could be sold for a price which would enable New England Web to satisfy its current liabilities and also the balance on the chattel mortgage.[2]

In short, we have no hesitation in agreeing with the Trial Examiner that "the facts plainly disclose the financial distress of New England Web." While it is true that there is no evidence in the record that the company had formally considered closing down operations prior to the advent of the Union, it is equally true that the officers felt that some decisive measures were necessary to avert the rapidly deteriorating economic position of the company. The decision to change the mode of compensation was significant evidence of this. When this decision—far from immediately ameliorating the company's economic position—caused a walkout and a strike by the weavers and their subsequent unionization, then this was assuredly a new factor to be considered by the New England Web management in determining a future course of action. Viewed in the context of the shaky financial status with which New England Web was confronted, a decision—at that point—to go on no more cannot be said to be inherently implausible. As was stated by the court in N. L. R. B. v. Lassing, supra: "The advent of the Union was a new economic factor which necessarily had to be evaluated by the respondent as a part of the overall picture pertaining to costs of operation." 284 F.2d 781 at 783.

Certainly the company could reasonably expect the advent of the Union to affect its already precarious cost picture. The record indicates that the first

2. The record indicates that the books of New England Web were available to General Counsel at the hearing if there was any question as to the correctness of Jarvis' figures. General Counsel apparently raised no such question. Since the figures are uncontradicted, we accept them here.

act of the Union representative following the Union election on April 1 was to broach the subject of wages to Jarvis. Moreover, at the first bargaining session following the unionization—April 5—a union representative indicated to Jarvis that the workers would not return to New England Web for the wages which it had been previously offering. Again, in the language of the Court in Lassing, supra:

"It is completely unrealistic in the field of business to say that management is acting arbitrarily or unreasonably in changing its method of operations based on reasonably anticipated increased costs, instead of waiting until such increased costs actually materialize." Id., at 783.

While, subsequently, the Union and the weavers indicated some flexibility on wages, by then the decision to close down had been announced by New England Web.

Moreover, as noted, this decision to terminate activities was announced to the Union at a negotiation meeting and thereafter the company and the Union mutually discussed the number of employees that would be needed to "run out" the work, the rate of pay and the seniority of these workers. When the Union interjected a complaint about the status of a particular worker, the company took the action which the Union requested. In sum, the company notified the Union of its decision and proceeded to negotiate the details of the run out of work. There was no unilateral action by the employer.

The Board takes the position that the alleged shutdown was actually a subterfuge under which work done at New England Web was shifted to another company in which Jarvis had an interest. We have reviewed this evidence in detail and again agree with the Trial Examiner who concluded: "that the manner of interchange of work between New England Web and National Webbing was no different in practice after April 13 than it was prior to the strike. The on-

ly difference, not material to the issues here, seems to be that such interchange was effected during a time when it had been decided to run out all orders of New England prior to liquidation of its business. * * *"

For all of the foregoing reasons, we believe that New England Web committed none of the unfair labor practices found by the Board. Having made this determination, it is unnecessary for us to consider whether the four other corporations included in the complaint are to be regarded as a "single employer" within the meaning of the Act. Neither is it necessary for us to consider the scope of the Board's order.

A decree will be entered setting aside the order of the Board.