**DOBBS HOUSES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 19536.**

United States Court of Appeals Fifth Circuit.

Dec. 11, 1963.

Newell N. Fowler, Memphis, Tenn., Robert McD. Smith, Birmingham, Ala., William Fortas, Memphis, Tenn., for petitioner, Lange, Simpson, Robinson & Somervlle, Birmingham, Ala., Fowler & Fortas, Memphis, Tenn., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Warren M. Davison, Atty., Stuart Rothman, Gen. Counsel, Robert Sewell, Atty., N.L.R.B., Washington, D. C., for respondent.

Before RIVES, JONES and BELL, Circuit Judges.

JONES, Circuit Judge.

The petitioner, Dobbs Houses, Inc., asks this Court to set aside the decision and order of the National Labor Rela-

tions Board holding that it violated Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The Board seeks the enforcement of the order which directs the petitioner to reinstate sixteen discharged employees and to make them whole for any loss of pay. 135 N.L.R.B. 885.

The employees were discharged because they left their jobs and failed to return. Dobbs contends the employees walked out because of the discharge of a supervisor, that their walkout for such a reason was unprotected, and that their discharge was proper. The Board determined that the employee walkout was motivated by economic considerations and was hence protected. It also determined that if the cause of the walkout was the discharge of the supervisor, he was such a vital link between the employees and top management that walking out on account of his dismissal was nevertheless protected. We conclude that the Board's determination cannot stand.

This case involves the Luau Restaurant in Birmingham, Alabama. The employees named in the complaint were all waitresses, with the sole exception of bartender James Harris. The restaurant opened in December, 1960. The picture drawn by and on behalf of the discharged employees of working conditions was anything but a pretty one. The manager, White, according to credited testimony, was addicted to profane and abusive language in his dealings with the hired help, he was disrespectful to a few of the waitresses, and made promises in regard to meals which were not kept. The assistant manager, Cooper, was well liked by the waitresses and was regarded by them as having tried to alleviate some of the conditions giving rise to complaint, and acted generally as a buffer between the employees and White. Hostess Prickett, a supervisor, was wholly in sympathy with the employees and was uncooperative with the manager.

The critical day was March 2, 1961. Although it was disputed, the Trial Examiner found that White came into the kitchen and made a profane remark

which the Trial Examiner interpreted as having been directed to the Negro kitchen employees. The Board found that the language used was such as to be offensive to the white waitresses, although there was evidence from which it might have been inferred that some of them had some familiarity with the objectionable words. The Board, however, decided that the remark would have upset all of the employees who heard it or heard about it. All of the employees, it seems, did hear about it.

At approximately 5:45 P.M. Mrs. Prickett returned to the restaurant, apparently from her afternoon break. Cooper told her and several waitresses that White had accused him of organizing a walkout and asked them to deny this to White. White claimed that he had had communications to the effect that Cooper had been fomenting a strike. The Trial Examiner credited the testimony of Alice Jones, a baker in the kitchen, Robinson, a cook, and Moore, a cook, that Cooper had paid them on Thursday, March 2, and told them that there was going to be a walkout and they need not report the next day. Jones called White and told him this shortly after leaving work at 5:00 P.M. Friday was the usual pay day. In his testimony Cooper did not deny their statements. Nor did he ask any of the kitchen help to tell White that he had not said anything to indicate a belief that no one would be working the next day.

After the waitresses, in Cooper's presence, asserted to White that Cooper had not attempted to organize a walkout, White and Cooper had a meeting in White's office where Cooper was suspended or discharged. Cooper claimed that he thought he had been discharged. The waitresses thought he had been discharged. Walking from White's office to the door, Cooper told several of the waitresses not to leave on his account. According to Mrs. Prickett White followed Cooper out of the building and was told by Cooper that the waitresses were planning to walk out. White profanely

answered that no one had walked out on him in his twenty years in the business. Mrs. Prickett testified that this was the "last straw" and the basis of her determination to lead the waitresses out. The Trial Examiner did not believe her. After Cooper left Mrs. Prickett called Dean, resident manager of Dobbs House snack bars in the Birmingham area, even though the Luau fell without his jurisdiction. The first thing Mrs. Prickett told him was that Cooper had been fired. Mrs. Prickett also mentioned the unfulfilled promises relating to meals and White's cursing earlier in the day. She indicated to him that the waitresses were planning to walk out and she did not intend to stop them. Dean asked to speak to Cooper whom Mrs. Prickett called from outdoors. He said that he had gotten a raw deal.

Following her conversation with Dean, Mrs. Prickett attempted to call Mr. Dobbs, the President of Dobbs Houses, Inc., who was in Memphis. Apparently the Luau was too noisy to permit the completion of the call. Mrs. Prickett then went to a nearby Howard Johnson's Restaurant, taking the waitresses with her. Almost all of the waitresses employed at the Luau were involved in this incident. There are numerous references to the day shift, the night shift, and split shifts, but it is not clear which of the shifts were present and participated in the walkout. The Trial Examiner concluded that the walkout occurred at least an hour after the last of the night shift had come on duty. The record does not show that Harris walked out with the waitresses but he failed to appear for work the next day. White followed the waitresses out and attempted to tell them that Cooper had not been fired but they would not linger to listen. As they walked away, Cooper, standing outside, said, "Girls, you don't know how much I appreciate this."

The call to Dobbs was completed. Mrs. Prickett told him that the waitresses had walked out because Cooper had been discharged. This was Dobbs' version which the Trial Examiner expressly credited.

Dobbs admitted that Mrs. Prickett mentioned working conditions and meals in their conversation. Dobbs told Mrs. Prickett that she and the others should go back to work and that he or his executive vice president would meet with them the next morning. It was established that when the waitresses left the front door had been locked to prevent patrons, who could not be served without waitresses, from entering. Dean arrived shortly after the walkout and was admitted at the front door by a bartender who had remained on duty. This employee testified and the trial examiner found that he was at the door for twenty or thirty minutes after the arrival of Dean and that the waitresses did not appear. Mrs. Prickett testified, as did some of the waitresses, that after the call to Dobbs, and within fifteen minutes of their initial leave-taking, she and the waitresses attempted to return to work but found the door locked although they saw Dean enter and although they admitted that they made no attempt to use the rear door, which was not locked. There was an express finding by the Trial Examiner that there was no intention on the part of White or anyone else to exclude the waitresses.

Mrs. Prickett and the waitresses, or most of them, reported for work the next morning at eight o'clock. Dobbs, who had already come to Birmingham, met and discharged them all for failing to go back to work the night before. He refused to give them a hearing. The employees left, but came back about a half hour later and indicated to Dobbs that they were "ready to go back to work on [his] terms and conditions." Dobbs turned them down again and asked them to leave. The employees contacted a union representative and began picketing the restaurant. The placards they carried indicated that there was a dispute over the hourly rate of pay. This was the first indication of any wage controversy.

At this point mention should be made of the peculiar situation relating to one of the waitresses. She was off duty on March 2 and hence took no part in the walkout, but in response to a call from Mrs. Prickett, made that evening, she appeared the next morning for the meeting with Dobbs although she was not due to report for work until four o'clock that afternoon. She made common cause with the strikers and made no effort to report for work. The Trial Examiner found, and it appears that such a finding was required, that Dobbs had no knowledge that she had not participated in the walkout. The Examiner concluded that her position was no different than those who had walked out, especially since she made no effort to disassociate herself from those who had engaged in the walkout.

The Trial Examiner made an exhaustive analysis of the facts. He concluded that the strike was called to protest the action of management with respect to supervisory personnel, and hence unprotected. The Board took a different view. It held that the walkout was in protest of working conditions. After enumerating the complaints over employment most of them regarding White, the Board commented:

"Accordingly, while the timing of the walkout decision may justify inferring that it was 'triggered' by the discharge of Cooper, we are satisfied that such discharge action 'caused' the walkout only because it was the 'last straw' in the accumulation of grievances and other aggravations producing conditions of unrest." 135 N.L.R.B. 885, 888.

The Board held in the alternative that where as here the facts "establish that the identity and capability of the supervisor involved has a direct impact on the employees' own job interests and on their performance of the work they are hired to do, they are legitimately concerned with his identity." 135 N.L.R.B. 885, 888. For this proposition reliance is placed on several Board cases and on N. L. R. B. v. Phoenix Mut. Life Ins. Co., 7 Cir. 1948, 167 F.2d 983, cert. den. 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395.

Initially and primarily, we are faced with a credibility problem. The Trial

Examiner found that while the employees might have walked out because of the economic conditions, they in fact did not. He relied on statements made at the time of the walkout as reflecting its true basis rather than the reasons for the walkout subsequently assigned at the hearing. For the Board to have reached its ultimate conclusion, that the walkout was economically motivated, it necessarily rejected the Trial Examiner's determination and credited the reasons assigned, at least in part, at the hearing.

The theory of the Board that while Cooper's assumed discharge may have been the catalyst which set off the walkout, it was not the cause of it, is in a measure a semantic beclouding of the problem. The issue before us must be decided on the postulate that the Board believed, as the Examiner did not, that the waitresses walked out of the Luau because of working conditions, and that the Board did not believe, as the Examiner believed, that they left because of their assumption that Cooper had been discharged.

Consideration must be given to the judicial function with respect to conflicting credibility determinations of the Trial Examiner and the Board. Perhaps it would be equally accurate to state the question as being whether there is a judicial function in the credibility area, or are the courts required to accept, without doubt or question, the credibility determinations of the Board.

The dissent of Mr. Justice Frankfurter in N. L. R. B. v. Walton Manufacturing Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed. 2d 829, expressed his view that the majority had declared a rule that the credibility findings of the Board were "to be absolute and unreviewable." If this notion as to the holding of Walton be a correct one it would seem that there has been a modification of the statutory standard of review as announced by the Supreme Court in Universal Camera Co. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The problem has been touched upon by two circuits in addition to the Fifth Circuit.

In N. L. R. B. v. New England Web, Inc., 1st Cir. 1962, 309 F.2d 696, the Board had found, among other things, that the employer had interrogated its employees in violation of Section 8(a) (1). The Trial Examiner reviewed the testimony at length, crediting the employer's witnesses and discrediting the testimony produced by the General Counsel. The Board upheld the General Counsel's exceptions to the Examiner's report. The Board refused to sustain the Trial Examiner's findings on the ground that he had failed to "consider" the testimony of some of the General Counsel's witnesses. The Court, citing Walton, set aside the Board's order in this respect. It said:

"In short, the Trial Examiner's report—his analysis of the evidence and his citation of the relevant cases—showed an acute awareness of the principles which govern the conduct proscribed by Section 8(a) (1) of the Act. On this record we are unwilling to upset his determination of credibility either directly or by the more circuitous method of speculating that portions of the evidence detailed with particularity were 'merely set out' but not 'consider[ed].' "

The Court's decision was compelled, or so it thought, by the Walton opinion from which it quoted the following:

"But the Examiner * * * sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records. As we said in the Universal Camera case * * * 'The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. * * *' For the demeanor of a witness '* * * may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a

motive to deny, may be uttered with such hesitation, discomfort arrogance, or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.' Dyer v. MacDougall [2 Cir.], 201 F.2d 265, 269. * * *" 309 F.2d 696, 700.

The Fourth Circuit, in N. L. R. B. v. Threads, Inc., 1962, 308 F.2d 1, had before it and seemingly rejected credibility findings of the Trial Examiner which were adopted by the Board. In its opinion the Court cited and discussed both the majority and dissenting opinions in Walton. Disagreeing with Justice Frankfurter, that the Supreme Court had held "the Board's power in reviewing the dead record to determine witness credibility 'to be absolute and unreviewable,'" the Court felt "warranted in following the principles announced in Universal Camera as a guide in reviewing such cases as the one before us." 308 F.2d 1, 6–7. It seems clear from the Fourth Circuit's opinion that it considered Walton as doing nothing more than disapproving the doctrine announced by this Court in N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 1941, 122 F.2d 433, where it was held that a different credibility standard might be applied in wrongful discharge cases than in other situations.

In N. L. R. B. v. Florida Steel Corp., 5th Cir. 1962, 308 F.2d 931, the Trial Examiner and the Board refused to credit the employer's reasons for discharging certain employees. The employer had claimed, inter alia, that production was not commensurate with the number of men working. The Trial Examiner had discredited this explanation on the ground that it was incredible that the employer should discharge "the producers when more output was needed!" 308 F. 2d 931, 935. This Court, however, stated that the rejection of this testimony could not be sustained. The Court said:

"Whether the solution to the production problem was the discharging of workers not doing the work, or an employee relations program to urge them on to bigger and better things was a decision properly to be made by management, not by the Board. The Board makes much of the fact that it seems improbable that one having trouble meeting production needs would discharge a large group of employees. This is a non sequitur. Bad help may be worse than no help at all." 308 F.2d 931, 936.

In construing the Walton case, this Court pointed out that "We do not read Walton to say that the Examiner's and Board's findings as to credibility must be accepted no matter how implausible they may be. * * * There is no requirement 'that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve.' Universal Camera Corp. * * *." 308 F.2d 931, 936. This Court, in its Florida Steel case, adopted a position approximating that of the Fourth Circuit. Having reached the conclusion that the Walton decision has not in any way modified the principles of Universal Camera, we look to it for guidance and find the following:

"The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial.'" 340 U.S.

474, 496–97, 71 S.Ct. 456, 95 L.Ed. 456.

██ It is, of course, the findings of the Board that are before us for review, and the same standards are to be applied whether or not the Board has agreed with the Trial Examiner. N. L. R. B. v. Universal Camera Corp., supra. We do not think that any inference should be drawn from this case or Florida Steel that we are attempting to restrict the Board in its review of credibility findings to the same standard that the Labor Act imposes on us. While the First Circuit in New England Web would appear to have drawn that inference from Walton, we do not. The credibility determinations of the Board cannot be disturbed unless unsupported by substantial evidence on the record considered as a whole. The Trial Examiner's report is a part of the record as a whole which is to be considered. N. L. R. B. v. Universal Camera Corp., supra.

██ After reviewing the record we are convinced that we cannot sustain the Board's rejection of the Examiner's credibility findings and the consequent determination of the Board that the walkout was induced by the various employment conditions brought out at the hearing before the Trial Examiner. As the Trial Examiner pointed out, the union representative and the respondent's witnesses at the time of the hearing knew that Cooper's apparent discharge was an invalid reason for going out on a strike. Hence we conclude that the Trial Examiner reached the only permissible result in his determination that the cause of the walkout was to be determined, under the circumstances, by the declarations and actions of the employees at the time rather than the reasons which were given at the time of the hearing. Whether White's action was such that it might have justified a protest walkout, the fact is, as the Examiner found upon the statements made at the time of and declaring the purpose of the strike by the leader of it, the conduct of White was not the cause of the walkout. It seems clear that there would have been no labor dispute on March 2 if the waitresses had not been induced to believe that Cooper had been discharged.

██ The Board brushes aside, too lightly we think, the significance of the apparent discharge of Cooper on the theory that at most it merely triggered, but did not cause, the walkout. We decide that there is not substantial evidence supporting its findings. To hold otherwise would be the equivalent of justifying a strike in protest of a managerial prerogative if a working condition existed which might have been made the basis of a labor dispute. In the absence of exceptional circumstances or conditions, it is the settled rule that concerted activity over a change in supervisory personnel is not protected. N. L. R. B. v. Ford Radio & Mica Corp., 2d Cir., 1958, 258 F.2d 457; N. L. R. B. v. Coal Creek Coal Co., 10th Cir. 1953, 204 F.2d 579; N. L. R. B. v. Wallick, 3rd Cir., 1952, 198 F.2d 477; N. L. R. B. v. Reynolds International Pen Co., 7th Cir., 1947, 162 F.2d 680. It cannot be said that the presence of bad working conditions may render protected that which is otherwise unprotected.

The Board's alternative holding poses the question as to whether this case falls into that category of cases which hold that employees may not be discharged for making known their ideas on managerial supervision, where that supervision is so directly related to their own employment, that their actions can properly be denoted as activities for their mutual aid and protection. N. L. R. B. v. Guernsey-Muskingum Elec. Co-op., Inc., 6th Cir., 1960, 285 F.2d 8; N. L. R. B. v. Phoenix Mut. Life Ins. Co., supra. In the Phoenix case two insurance salesmen were discharged while in the process of drafting a letter to the central management recommending that their assistant cashier be promoted to the cashier's job which was then vacant. As the court stated in that case, "[t]he Board found that the capability and competency of the cashier had a direct connection with and relationship to the working conditions of respondent's salesmen, and sub-

stantial evidence supports the Board's finding." 167 F.2d 983, 987. The salesmen were dismayed at the prospect of going through the time-consuming process of breaking in a new cashier, an experience they had been through four times in the recent past. The court held that the letter-drafting was protected activity. The court said:

"Here Davis and Johnson and other salesmen were properly concerned with the identity and capability of the new cashier. Conceding they had no authority to appoint a new cashier or even recommend anyone for the appointment, they had a legitimate interest in acting concertedly in making known their views to management without being discharged for that interest. The moderate conduct of Davis and Johnson and the others bore a reasonable relation to conditions of their employment." 167 F.2d 983, 988.

In Guernsey three employees complained at different times of the capability of the foreman, who was a summer employee and the son-in-law of the operations manager. One of the employees, it was found, was fired for this. First finding that the activity was concerted, the court went on to hold it protected, relying on Phoenix. In Cleaver-Brooks Mfg. Corp. v. N. L. R. B., 7th Cir., 1959, 264 F.2d 637, cert. den. 361 U.S. 817, 80 S.Ct. 58, 4 L.Ed.2d 63, operations were inefficient under the incumbent foreman and the employer discharged him and appointed a new one. When the employees learned this they walked off the job. Four of these, who were the most adamant in their unwillingness to work under the new foreman, were discharged. The Seventh Circuit, faced with its earlier decision in Phoenix nevertheless held for the employer. Its opinion distinguishes the earlier decision:

"The Phoenix case is easily distinguished from the case before us. There no work stoppage, intemperate language, or refusal to accept supervision was involved. * * * The four men discharged here adopted no such moderate conduct in making known to management their views * * *." 264 F.2d 637, 640–41.

■ In supporting its holding the court went on, "[o]therwise, on the facts of this case, one would have to argue that it was in the employees' legitimate interest to maintain the inefficient and inadequate supervision previously provided." 264 F.2d 637, 641. Within these excerpts the two aspects of the problem become clear: First, it is necessary to determine the legitimacy of the employees' interest. In other words, is the object which they seek within the area of their proper concern so that means to accomplish this object might fall within the protection of Section 7. Cf. Joanna Cotton Mills Co. v. N. L. R. B., 4th Cir., 1949, 176 F.2d 749.

Under the circumstances of this case, the dismissal of Cooper might be within the realm of proper employee interest. Considering that White was apparently objectionable, at least to the waitresses, that he did nothing to alleviate the employees' grievances, and was lacking in respect for the dignity and modesty of the waitresses, it could be held that the discharge of Cooper, the sympathetic buffer, was within their legitimate concern, and this despite Cooper's misdeeds and insubordination. In this regard the case here falls within the Phoenix and Guernsey rule.

However, the other test which must be met to determine the protected character of the employees' activity is that the means be reasonably related to the ends sought to be achieved. The cases where the courts have found that employees' protest activity against a change in supervisory personnel was unprotected have all involved strikes. Cleaver-Brooks Mfg. Corp. v. N. L. R. B., supra; N. L. R. B. v. Ford Radio & Mica Corp., supra; N. L. R. B. v. Coal Creek Coal Co., supra; N. L. R. B. v. Wallick, supra; N. L. R. B. v. Reynolds International Pen Co., supra. While the fact of a strike may not of itself be decisive, such conduct must be contrasted with the incomplete

letter in Phoenix and the several complaints in Guernsey. At any rate it is our conclusion that the course taken by the waitresses here, walking out at the height of the dinner hour and staying out for the entire night, was an unreasonable way to make known their concern to the employer over their mistaken belief that Cooper had been discharged.

■■■ The Board urges that a strike is not rendered unprotected because of "the availability to the employees of other concerted activities short of striking * * * [or] the reasonableness or wisdom of their selection of a particular course of action." In support of this position the Board cites N. L. R. B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 and N. L. R. B. v. Mackey Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. We do not disagree with the proposition of law stated, but it is premature. The reasonableness of a course of action must be determined initially to ascertain whether in fact it is protected. Caterpillar Tractor Co. v. N. L. R. B., 7th Cir. 1956, 230 F.2d 357; N. L. R. B. v. Marshall Car Wheel & Foundry Co., 5th Cir. 1955, 218 F.2d 409; N. L. R. B. v. J. I. Case Co., 8th Cir., 1952, 198 F.2d 919, cert. den. 345 U.S. 917, 73 S.Ct. 729, 97 L.Ed. 1351. Cf. Time-O-Matic, Inc. v. N. L. R. B., 7th Cir. 1959, 264 F.2d 96. The cause of the employees' grievance must be considered in determining the reasonableness of their course of conduct undertaken in protest. We have not here reached the stage of Washington Aluminum. There the men were working under intolerably cold conditions. Without a union or grievance procedure, concerted activity to protest took the form of a walkout. The conditions there were within the proper realm of employee interest, and the walkout, while extreme under the circumstances, was reasonably related to the complaint. Under the law as we find it, a mass departure by waitresses during the dinner hour is not a reasonable method of protest against the firing of a supervisor who enjoys their esteem.

Our decision on these two issues renders it unnecessary to consider the parties' other contentions. The petition to vacate is granted. The Board's cross-petition to enforce its order is denied.

Order vacated and enforcement denied.