**AMERICAN ART CLAY COMPANY, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 14208.

United States Court of Appeals Seventh Circuit.

Feb. 19, 1964.

Kiley, Circuit Judge, dissented.

Henry C. Ryder, Jack H. Rogers, Indianapolis, Ind., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, William J. Avrutis, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Attys., N.L.R.B., Washington, D. C., for respondent.

Before DUFFY, SCHNACKENBERG and KILEY, Circuit Judges.

DUFFY, Circuit Judge.

This is a petition to review an order of the National Labor Relations Board (Board).[1a] In answer to the petition, the Board has requested enforcement of its order.

Petitioner has its plant and place of business in a small community located close to Indianapolis, Indiana. It is engaged in the manufacture of school supplies, including kilns, crayons, chalk and finger paints. For more than fifteen years prior to September 20, 1962, the foreman of the kiln department was Bud Stuard. About September 1, 1962, Stuard became ill. At that time, Jacob Schell was Stuard's assistant, and he acted as foreman in the kiln department during Stuard's illness. Schell changed some of Stuard's practices and procedures. He instructed the employees what kind of kilns to make and directed them to fill the oldest orders before building kilns for stock. Instead of letting the employees of the kiln department work on anything they desired, Schell used a card system by which the employee was given a card each morning, listing the orders and types of kilns upon which he was to work. Under Stuard, the kiln employees had been left "pretty much alone."

Stuard returned to work on Monday, September 17, and asked that Schell con-

---

1. In § 205(g) of the Act, the Secretary is referred to by this impersonal pronoun.

1a. Reported at 142 N.L.R.B. No. 75

tinue as foreman until he could catch up with what had been going on in his absence. Schell continued his practice of issuing daily instructions on cards to each employee.

On September 20, 1962, at about 9:30 in the morning, Ed Smither, the plant superintendent, made the decision to change Bud Stuard to foreman of the wheel department (which had previously been a part of the kiln department), and to make Schell foreman of the remainder of the kiln department. This change did not affect Stuard's pay or other benefits.

Although no official announcement had been made of the change, by 10 a. m. a small group of employees led by Henderson Gregory began notifying the other employees of the kiln department that the entire kiln and wheel departments were going to walk out "in sympathy for Bud Stuard" whom, they thought, had been down-graded.

When approached, employee Joe Songer apparently sounded a note of caution. He told employee Bill Convey "that their decision on walking out in sympathy of a foreman was not right and we do not have the right to do that in regards to management," and that "management had the right to hire their supervision. * * *" Songer suggested to Convey that they take more time at noon and talk things over. Apparently this advice was not heeded.

There is no evidence that the employer had any knowledge of any employee dissatisfaction or unrest. The employees who walked out on September 20th had no union affiliation and there is no evidence of any connection between the walkout and any union agitation.

About ten minutes before the noon break on September 20, 1962, Jim Sheads, the assistant plant superintendent, called the men of the kiln department together to inform them of the change of foreman. While making the announcement, Sheads was interrupted by Joe Songer who said that the change was not fair to Bud Stuard, and that if the change in foreman was because the Company wanted more production, then the men wanted more money. There is some evidence that some employees cried out, "That's right, we're with Joe."

There is no evidence that Joe Songer had received any authority from the other employees to speak in their behalf. Nor is there any evidence that the employees of the kiln department had any conversation among themselves or with any one else concerning a request for either higher wages or improved working conditions. At no time during the morning of September 20, 1962, nor at any time immediately prior thereto, had any employee or group of employees approached company officials and requested higher wages or better working conditions.

The employees did not return to the kiln department at the 1 p. m. starting time. Instead, they gathered in the parking lot. A short time later when the walkout was reported to Philpott, the president of petitioner, Sheads informed him that the walkout was due to the change of foreman. After some discussion, Philpott made the decision to discharge all of the employees of the kiln department who had walked out.

All twenty-nine men in the kiln department were discharged. Subsequently, eighteen of these employees were reemployed. Six of the eleven men not reemployed, made application for re-employment. Five of the men, including Joe Songer, never submitted application for re-employment.

The trial examiner found that the change in foreman created the initial impetus for a walkout. However, he found that the employees as a group, acting through Songer, were claiming it was unfair to get more production without paying the men more money.

The Board adopted the Trial Examiner's report and applied the rule of Dobbs Houses, Inc. (1962), 135 N.L.R.B. 885, holding a strike over an employer's selection or termination of a supervisor is a protected activity under the Act, if the identity and capabilities of the super-

visor involved has a direct impact on the employees' own job interests and work performance.

In N. L. R. B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680, this Court decided that employees who engage in a walkout because of a dissatisfaction with a change in foreman, are not protected by the Act and are subject to discharge. This rule was followed for fifteen years not only by other Circuits,[2] but also by the Board as well. Fontaine Converting Works (1948), 77 N.L.R.B. 1386; Wallick & Schwalm Co. (1951), 95 N.L.R.B. 1262; Armstrong Cork Co. (1955), 112 N.L.R.B. 1420.

However, in 1962, the Board decided Dobbs Houses, Inc., 135 N.L.R.B. 885. This case involved the discharge of waitresses who walked out in protest because of the discharge of their supervisor. The Board decided the walkout was "protected." This engrafted an exception on the rule of Reynolds. The exception was that if the identity and capabilities of the supervisor have a direct impact on the employees' own job interest, they are legitimately concerned with his identity. We suggest that it is difficult to imagine a case in which the identity and capabilities of a supervisor cannot be said to have a direct impact on the employees' job interests and work performance.

As a reason for the new rule, the Labor Board, in Dobbs, relied on a decision of this Court, to-wit: N. L. R. B. v. Phoenix Mut. Life Insurance Co., 7 Cir., 167 F.2d 983, 6 A.L.R.2d 408. This decision was handed down about a year after the date of our decision in Reynolds Pen.

We think our decision in Phoenix Mutual is no proper basis for the Board's decision in Dobbs Houses, Inc. In Phoenix, several insurance salesmen drafted a letter to management concerning the selection of a cashier. The Company discharged the two salesmen principally involved. The Labor Board ordered their reinstatement. By a two to one decision, this Court affirmed.

In Phoenix there was no walkout or strike. We emphasized the moderate conduct of the salesmen. We stated, 167 F.2d at page 988: " * * * Conceding they had no authority to appoint a new cashier or even recommend anyone for the appointment, they had a legitimate interest in acting concertedly in making known their views to management without being discharged for that interest. The moderate conduct of Davis and Johnson and the others bore a reasonable relation to conditions of their employment."

We appreciate the compliment in having the Board rely on a decision of this Court, but it is difficult to understand how our later decision in Cleaver-Brooks Mfg. Corporation v. N. L. R. B., 7 Cir., 264 F.2d 637, was overlooked. In Cleaver-Brooks, four employees who complained vehemently over a change in foreman, engaged in a twenty-five minute strike. They were discharged. In upholding the discharge of these four employees, this Court distinguished the Phoenix Mutual case. We said, 264 F.2d at page 640: "The Board takes the position that protest over the appointment of a foreman is a concerted activity protected by the Act, citing as authority our ruling in N. L. R. B. v. Phoenix Mutual Life Insurance Co., 7 Cir., 1948, 167 F.2d 983, 6 A.L.R.2d 408, certiorari denied 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395.

"The Phoenix case is easily distinguished from the case before us. There no work stoppage, intemperate language, or refusal to accept supervision was involved. * * * The four men discharged here adopted no such moderate conduct in making known to management their views * * *."

Prior to the date of its decision in Dobbs Houses, Inc., the Board had recognized the distinction between moderate conduct as a protected activity on one

---

2. N. L. R. B. v. Ford Radio & Mica Corp. (2 Cir.), 258 F.2d 457; N. L. R. B. v. Coal Creek Coal Co. (10 Cir.), 204 F.2d 579; N. L. R. B. v. Wallick (3 Cir.), 198 F.2d 477, and Joanna Cotton Mills Co. v. N. L. R. B. (4 Cir.), 176 F.2d 749.

hand and intemperate activities during working hours which destroy the efficient operation of an employer's .business, on the other. Ace Handle Corp. (1952), 100 N.L.R.B. 1279; Wood Parts, Inc. (1952), 101 N.L.R.B. 445; Hearst Publishing Company, Inc. (1955), 113 N.L.R.B. 384. In none of those cases was there a strike or walkout.

About a month after the last brief in the instant case was filed, the Court of Appeals for the Fifth Circuit, on a petition for review, considered the Board's decision and order in Dobbs Houses, Inc., 135 N.L.R.B. 885. The Court granted the petition to vacate; it denied the Board's cross-petition to enforce its order. Dobbs Houses, Inc. v. N. L. R. B., 5 Cir., 325 F.2d 531.

The Court of Appeals of the Fifth Circuit said at page 537 of 325 F.2d: "The Board brushes aside, too lightly we think, the significance of the apparent discharge of Cooper on the theory that at most it merely triggered, but did not cause, the walkout. We decide that there is not substantial evidence supporting its findings. To hold otherwise would be the equivalent of justifying a strike in protest of a managerial prerogative if a working condition existed which might have been made the basis of a labor dispute. * * * It cannot be said that the presence of bad working conditions may render protected that which is otherwise unprotected."

The Court of Appeals of the Fifth Circuit also emphasized a point which is pertinent to the instant case, where it stated that the cause of the walkout was to be determined by the declarations and actions of the employees at the time rather than the reasons which were given at the time of the hearing.

We adhere to our prior decisions in N. L. R. B. v. Reynolds International Pen Company, 162 F.2d 680, and Cleaver-Brooks Mfg. Co. v. N. L. R. B., 264 F.2d 637.

We hold that the decision and order of the Labor Board must be vacated and set aside. The request of the National Labor Relations Board for enforcement of its order is denied.

Order vacated and enforcement denied.

KILEY, Circuit Judge (dissenting).

I respectfully dissent.

The petitioner contended before the Trial Examiner that the walkout was unprotected because it was "in protest against a change in supervision" which "had no direct impact on the employees' job security or work performance." This contention was rejected by the Examiner after referring to the Board's decision in Dobbs Houses, Inc., 135 N.L.R.B. 885 (1962).[1] The Examiner then proceeded to his ultimate finding of fact that while the change in foremen "set in motion" the chain of events which resulted in the strike or walkout, "the strike or walkout itself was over terms and conditions of employment for the mutual aid and protection of the employees." From this finding the Examiner concluded that the employees were engaging in a "protected economic strike or activity within the meaning of Section 7" of the National Labor Relations Act.

The Board adopted the "findings, conclusions and recommendations" made by the Trial Examiner.

There is no dispute about the relevant facts: Until the morning of September 20, 1962, when Stuard's removal came to the notice of the employees, there had been no discussion of a walkout, although during Stuard's hospitalization some employees had objected to Schell's "pushing" for greater production. The employee dissension began with the change in foremen, when they began talking about a walkout because of the change. The dissension fomented complaints about working conditions, and about being paid the same "peanuts" as the year before. After the morning coffee break Songer expressed some doubt about the legality of a walkout merely because of a change in foremen, and it was agreed among some of the employees that they would

---

1. Reversed, 325 F.2d 531 (5th Cir. 1963).

not walk out until they met for further discussion during the lunch hour.

At 11:50 a. m., ten minutes before the lunch hour, Sheads, the assistant plant superintendent, called the department employees together and told them Stuard was being replaced by Schell, and called for the employees' cooperation. Songer interrupted and said the employees should be paid more, since Schell was making them produce more. Several of the men present spoke up and said Songer was speaking for them, and Sheads understood Songer was speaking as spokesman for the group. He did not respond with respect to wages, but said the change was better for the employees and the company. Songer then stated that if that was the way it was going to be, the men were going to walk out. Sheads told the group the door was open for those who did not want to work, and he left the meeting as the men punched out for lunch.

Some of the men *at this time* thought that the walkout, if there was one, was going to be out of sympathy for Stuard. There had been no walkout at this time. At 12:45 p. m. the men gathered in the company parking lot and discussed working conditions and wages. The meeting resulted in an agreement that no one would return to work for less than a 25 cent an hour wage increase. They decided to wait, if necessary, until 1:45 p. m. for a company representative to approach them, and then to go to the State Division of Labor for guidance. *The walkout began at 1:00 p. m.* with their failure to return to work.

A little after 1:00 p. m. Sheads, seeing the men had not returned to work, told the company president that the men had walked out "because of the change of foremen." The president thereupon ordered the men discharged. About 1:15 or 1:20 p. m., Sheads and Sandoe, a company officer, came out into the parking lot and stood about 150 feet away from the men. They did not approach the men. The men did not approach them. At this time the men were already discharged. Later on they were denied return to their work.

It is my opinion that the Board, on the evidence, and in light of the whole record, could reasonably infer, as it did, that the employees were engaged in a walkout over terms and conditions of employment, a protected, concerted activity for their mutual aid and protection under § 7 of the National Labor Relations Act, and that their discharge was an unlawful violation of § 8(a) (1) of the Act.

The Board's decision, before us, was substantially the same as that in the first issue reached in Dobbs Houses, Inc. v. N. L. R. B., 325 F.2d 531 (5th Cir. 1963), involving the Board's determination "that the employee walkout was motivated by economic considerations and was hence protected." 325 F.2d at 532. On this issue the Fifth Circuit in Dobbs was "convinced that we cannot sustain the Board's rejection of the Examiner's credibility findings * * *."

The remaining issue is whether the discharge was not an unfair labor practice because the petitioner did not know and had no means of knowing that the employees were engaged in a protected activity; and that, in fact, petitioner in good faith believed that they had walked out because of the change in foremen. For this contention petitioner relies principally on N. L. R. B. v. Ford Radio & Mica Corp., 258 F.2d 457 (2d Cir. 1958).

The Examiner found that Sheads "was made aware" by the employees of their demand for more money and of their intention to walk out if their claim was ignored. This finding is supported by substantial evidence, and distinguishes Ford Radio & Mica Corp. There the employer had no knowledge of the protected character of the walkout. Here the company, through Sheads, knew or should have known that the walkout was a protected activity, and therefore petitioner's contention cannot be sustained. It does not matter that the protected character of the walkout was not reported to the company president, who was told only that the walkout was "because of the change in

foremen." I agree with the Examiner in his citation of Allegheny Pepsi-Cola Bottling Co. v. N. L. R. B., 312 F.2d 529, 531 (3d Cir. 1963), "To rule otherwise would provide a simple means for evading the Act by a division of corporate personnel functions."

I have discussed the only issues I consider relevant. There is therefore no necessity for me to discuss the second issue in the Dobbs opinion in which the court reversed the Board's "alternative holding" that the walkout over the discharge of a supervisor was a protected activity, nor to discuss Cleaver-Brooks Mfg. Corp. v. N. L. R. B., 264 F.2d 637 (7th Cir. 1959), cert. denied, 361 U.S. 817, 80 S.Ct. 58, 4 L.Ed.2d 63, N. L. R. B. v. Phoenix Mutual Life Ins. Co., 167 F.2d 983, 6 A.L.R.2d 408 (7th Cir. 1948), cert. denied, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395, and N. L. R. B. v. Reynolds International Pen Co., 162 F.2d 680 (7th Cir. 1947).

I would deny the petition and enforce the order.