**BOB EVANS FARMS, INCORPORATED, Petitioner–Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross Petitioner.**

**Nos. 97–4095, 98–1119.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1998.

Decided Dec. 17, 1998.

1014

Robert A. Harris, Chris J. North (argued), Vorys, Sater, Seymour & Pease, Columbus, OH, for Petitioner in No. 97–4095.

Jill A. Griffin (argued), National Labor Relations Bd., Contempt Litigation Branch, Washington, DC, John D. Burgoyne, National Labor Relations Bd., Appellate Court, Enforcement Litigation, Washington, DC, Glenn A. Zipp, National Labor Relations Bd., Peoria, IL, for Respondent in No. 97–4095.

Daniel V. Yager, McGuiness & Williams, Washington, DC, for Amicus Curiae in Nos. 97–4095 and 98–1119.

Robert J. Englehart, Jill A. Griffin, (argued), National Labor Relations Bd., Contempt Litigation Branch, Washington, DC, John D. Burhoyne, Frederick Havard, National Labor Relations Bd., Appellate Court, Enforcement Litigation, Washington, DC, Glenn A. Zipp, National Labor Relations Bd., Peoria, IL, for Petitioner in No. 98–1119.

Robert A. Harris, Chris J. North (argued), Vorys, Sater, Seymour & Pease, Columbus, OH, for Respondent in No. 98–1119.

Before CUDAHY, COFFEY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

When Diane Gorrell was fired from a Bob Evans restaurant in East Peoria, nearly all of the employees under her supervision walked off the job at the start of a busy Friday evening shift. The employees later sought to return to work but Bob Evans refused to reinstate them. This matter comes before us on cross applications to set aside and enforce an order of the National Labor Relations Board requiring Bob Evans to allow the employees to return to work. The Board adopted the ALJ's decision that Bob Evans had committed an unfair labor practice by interfering with the employees' right to engage in concerted protected activity under the National Labor Relations Act. *See* 29 U.S.C. § 158(a)(1). The ALJ found that the walkout was protected since the employees believed that Gorrell's dismissal would have a negative impact on their working conditions. However, neither the ALJ nor the Board addressed the further question whether the walkout was a reasonable means of protest. We agree that the employees had a protectable grievance. But because the

Board should have considered the means of protest and because we find the walkout an unreasonable means, we deny the Board's application for enforcement of its order.

## I.

The background facts are fairly straightforward. As First Assistant Manager at the East Peoria restaurant, Gorrell was one of five statutory supervisors and was second in command to General Manager Andy Dunlap. Gorrell was in charge of the night shift, a responsibility assumed by Second Assistant Manager Mark Weaver on Gorrell's scheduled days off. Gorrell enjoyed a close working relationship with the hourly employees under her supervision. Individual employees frequently turned to her for comfort and counsel over work-related problems and she in turn mediated their grievances with her superiors. These grievances ranged from seemingly trivial disagreements over day-to-day restaurant practices to serious complaints, such as management and supervisor harassment of female and minority employees and an arbitrary termination of employment. Gorrell also socialized with the night-shift employees, many of whom were welcomed as guests at her home.

Ironically, the events that precipitated Gorrell's departure from the ranks of Bob Evans took place on a scheduled day off for Gorrell, Sunday October 15, 1995. Weaver—who was supervising the night shift—was evidently in over his head. A lack of staff and a shortage of food generated intense customer dissatisfaction. Two of the employees telephoned Gorrell who came in, took over the shift and restored order. Weaver was left in no doubt of Gorrell's displeasure and her exasperation at Manager Dunlap's apparent inability to run the restaurant. At about 10:00 p.m., shortly before closing time, Gorrell convened an impromptu pizza party in the restaurant area which degenerated into a raucous food fight. She neither encouraged nor condemned these antics, choosing instead to sit at the counter with other employees drinking alcohol under Weaver's watchful eye. At about 4:00 a.m., the merry troop left the restaurant to continue the festivities at Gorrell's house. Unfortunately,

just two hours later and still inebriated, Gorrell had to catch a ride to a pre-scheduled management meeting in the company of Bob Evans Area Director, Dave Ward.

Gorrell's next scheduled shift was Friday October 20, 1995. At about 4:00 p.m., Dunlap called Gorrell into his office and, after a heated exchange, informed her that her services were no longer required. Several night-shift employees who were preparing to come on duty had gathered near Dunlap's office and watched events unfold. As Gorrell left she told them that she had been fired and within a matter of minutes fifteen employees had walked off the job. They congregated outside the restaurant entrance for five to ten minutes and conversed with approaching customers, inevitably encouraging some to dine elsewhere. Dunlap called the police and the employees disbanded under threat of arrest. Having re-grouped at Gorrell's house, the employees collectively called Area Director Ward seeking an explanation for Gorrell's termination and inquiring about their own job security. According to Ward—whom the ALJ found to be less than credible—the employees informed him that they had quit and made no offer to return. But Ward later instructed Dunlap not to re-hire those employees that had called the restaurant in the days after the walkout looking to get back on the job. In a letter dated November 7, 1995, all but one of the employees made an unconditional offer to return to work. Citing its published policy of treating hourly employees who walk off the job without permission as "voluntary quits," Bob Evans took the position that the employees had abandoned their posts—leaving the restaurant in dire straits—and refused to reinstate them.

That the walkout had a far-reaching effect on the operation of the restaurant is undisputed. Without notice, the restaurant was left virtually unattended at the start of what was characteristically one of its busiest shifts. Some day-shift employees were persuaded to stay on that evening and Dunlap managed to call in extra help from other restaurants. But the die had been cast and the best that Bob Evans could hope for was to limit the damage: service was poor, customers got angry, bills were not paid and business was lost. Repercussions were felt over the next few days with continued customer service problems and further walkouts—this time by two employees fed up with the onerous working conditions imposed in the wake of the initial walkout.

On November 9, 1995, Gorrell filed an unfair labor practice charge with the Board on behalf of the employees who had walked off the job. The General Counsel filed a complaint and a hearing was conducted before an ALJ on December 4 and 5, 1996. On November 8, 1997, the Board issued an order incorporating the ALJ's findings and adopting his recommendations with minor modifications. The order required Bob Evans to offer the employees full reinstatement to their former or equivalent positions, to make them whole for any losses sustained and to expunge from their personnel files any negative trace of the incident. Bob Evans now petitions this court, seeking to set aside the Board's order of November 8, 1997. The Board cross-petitions seeking enforcement of its order.

## II.

First we must clarify a tricky question concerning the appropriate standard of review. Relying on *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Board argues that we must defer to its view that the method of protest—in this instance a walkout—is not of consequence in determining whether employee conduct is protected under the Act. The Board has invoked *Chevron* as a means of distinguishing certain federal court of appeal precedents that are adverse to its position. According to the Board, the Supreme Court's decision in *Chevron* has deprived these otherwise authoritative precedents of their authority. But the applicability of *Chevron* in this context is by no means clear. Thus, under *Chevron*, when a court reviews an agency's construction of a statute which it administers, it must first ask whether Congress has spoken directly to the precise question at issue for the unambiguously expressed intent of Congress must be controlling. However, "if the statute is silent or ambiguous with respect to the specific issue,

the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. The reviewing court may not substitute its own construction for a reasonable interpretation on the part of the agency. *See id.* at 844, 104 S.Ct. 2778; *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398–99, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996) ("When the legislative prescription is not free from ambiguity, the administrator must choose between conflicting reasonable interpretations. Courts, in turn, must respect the judgment of the agency empowered to apply the law 'to varying fact patterns,' even if the issue 'with nearly equal reason [might] be resolved one way rather than another' ") (citations omitted). Citing its authority to make an initial determination whether a matter comes within the protection of the National Labor Relations Act, the Board maintains that its proffered construction—that employees enjoy an unfettered right to engage in peaceful strike activity in protest over changes in supervisory personnel—is reasonable. As indicated, the Board concedes that its construction is contrary to judicial precedent in this and other circuits but argues that in deferring to its interpretation we must re-evaluate any inconsistent holdings we may have adopted pre-*Chevron*.

■ In general, the Administrative Procedure Act sets out the standards which govern judicial review of administrative actions. *See* 5 U.S.C. § 706. The functional equivalents of these standards apply to the Board by operation of Section 10 of the National Labor Relations Act. *See* 29 U.S.C. §§ 160(e) & (f). The Board's factual findings are reviewed to determine whether they are supported by substantial evidence on the record as a whole, *see NLRB v. Alwin Mfg. Co.*, 78 F.3d 1159, 1162 (7th Cir.1996), or, to put it another way, "such relevant evidence as a reasonable mind might accept as adequate." *NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1471 (7th Cir.1992) (citations and internal quotations omitted). The Board's legal conclusions are reviewed to determine whether they have a reasonable basis in the law. *See* 29 U.S.C. § 160(f). Thus, they will be upheld "unless they are irrational or inconsistent with the National Labor Relations Act." *Augusta Bakery*, 957 F.2d at 1471 (cita-

tions and internal quotations omitted); *see also NLRB v. Howard Immel, Inc.*, 102 F.3d 948, 951 (7th Cir.1996).

■ Judicial deference to administrative findings of fact is clearly justified, especially given the particular expertise of the various agencies in their respective fields of specialization and their role as a maker of policy. In the case of agency conclusions of law, the justification is less obvious since resolving legal questions lies at the heart of the judicial function. The final word on the law—including statutory interpretation—rests with the courts. *See Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778 n. 9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."); *Ayala–Chavez v. INS*, 945 F.2d 288, 294 (9th Cir.1991) ("a reviewing court should defer to an administrative agency only in those areas where that agency has particular expertise"). As a practical matter, courts vary considerably in determining how much weight to accord an agency's conclusions of law. For a pre-*Chevron* articulation see *Coca Cola Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 608 F.2d 213, 223 (5th Cir.1979) ("It is impossible to quantify exactly the weight an administrative interpretation will be given in a particular situation. The agency determination is simply weighed against other factors, but it is not conclusive because, in the final analysis, 'the legal standard to be applied is ultimately for the courts to decide and enforce.' ") (citations omitted). By invoking *Chevron*, the Board is apparently seeking to replace the sliding scale of deference regularly applied to conclusions of law, often reflecting considerations of policy, with a uniform standard of deference.

Bob Evans asserts that the Board's reliance on *Chevron* is misplaced. It takes the position—which is endorsed by the Labor Policy Association acting as *amicus curiae*—that *Chevron* applies only in the context of agency rulemaking as opposed to agency adjudication. Since the case before us involves the purely adjudicative function of balancing the competing rights of employers and employees under the Act, Bob Evans contends that *Chevron* has no bearing on our review of

the Board's order. The issue in *Chevron* was whether regulations promulgated by the Environmental Protection Agency to implement the Clean Air Act Amendments of 1977 embodied a permissible construction of a statutory term. In adopting the regulations, the EPA was administering a congressionally created program which "necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron*, 467 U.S. at 843 (citing *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)). In other words, the EPA was exercising a rulemaking or quasi-legislative function imbued with policymaking responsibilities delegated by Congress. Federal judges have "no constituency" to make policy and have "a duty to respect legitimate policy choices made by those who do." *Id.* at 866, 104 S.Ct. 2778. Accordingly, "[w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." *Id.*

■ But the functions of rulemaking and adjudication are not mutually exclusive; frequently adjudication is the vehicle for a statutory interpretation that is functionally equivalent to a rule.[1] *See Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ("Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order."). The Board possesses both rulemaking and adjudicatory powers, *see* 29 U.S.C. §§ 156 & 160, but "uniquely among major federal administrative agencies has chosen to promulgate virtually all of the legal rules in its field through adjudication rather than rulemaking." *Allentown Mack Sales & Service, Inc.*

*v. NLRB*, 522 U.S. 359, 118 S.Ct. 818, 827, 139 L.Ed.2d 797 (1998). This convergence between the Board's rulemaking and adjudicative functions complicates the proposition that *Chevron* can never apply to agency adjudication. Since the Board develops general rules in the course of adjudication, there will invariably be occasions when a special degree of deference is appropriate. *See Holly Farms*, 517 U.S. at 397–99, 116 S.Ct. 1396 (applying *Chevron* to Board adjudication); *accord Mid–America Care Foundation v. NLRB*, 148 F.3d 638 (6th Cir.1998); *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119 (6th Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998).

■ Our recent decision in *International Ass'n of Machinists & Aerospace Workers* ("*IAM*") *v. NLRB*, 133 F.3d 1012 (7th Cir.), *cert. denied,* — U.S. ——, 119 S.Ct. 47, 142 L.Ed.2d 36 (1998), provides an apt illustration. In *IAM*, we reviewed an order of the Board specifying union procedures for the protection of union nonmembers in the collective bargaining process. The National Labor Relations Act contemplates the possibility of union shop clauses in collective bargaining agreements but the Supreme Court has held that employers are precluded from requiring union nonmembers to pay any portion of union dues that are used for activities unrelated to collective bargaining. *See Communications Workers of America v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988). *IAM* involved a challenge to Board-approved procedures designed to allocate union dues between activities related to collective bargaining and other union activities. In upholding the Board's order, we cited *Chevron*. *See* 133 F.3d at 1015 ("It is hard to think of a task more suitable for an administrative agency that specializes in labor relations, and less suitable for a court of general jurisdiction, than crafting the rules for translating the generalities of the *Beck* decision (more precisely, of the statute as authoritatively construed in *Beck*) into a workable system for determining and collecting agency fees."). The Board's chosen medium

---

1. "Rulemaking, the quasi-legislative power, is intended to add substance to the Acts of Congress, to complete absent but necessary details, and to resolve unexpected problems. Adjudication, the

quasi-judicial power, is intended to provide for the enforcement of agency statutes and regulations on a case-by-case basis." Jacob A. Stein et al., Administrative Law, § 1401.1 (1998).

for promulgating these rules was a 125–page opinion delivered in response to the complaint of a number of union nonmembers. Thus, the context was clearly adjudicative but the function was legislative in character. The Labor Policy Association misreads *IAM* when it criticizes that decision for incorporating a tacit assumption that *Chevron* applies to agency adjudication. To say that *Chevron* governs a particular case is not to assume that it applies equally to all agency adjudications. While the Board can, and occasionally does, make rules in the course of adjudication, the bulk of its orders have only a slight legislative dimension. Thus, the labels of rulemaking and adjudication are helpful but hardly decisive in establishing the standard of review.

 Although courts generally do not explain why *Chevron* does or does not govern a particular case, the prominence or obscurity of a legislative purpose or of policymaking itself is a factor. *See, e.g., International Ass'n of Bridge, Structural & Ornamental Ironworkers v. NLRB*, 946 F.2d 1264, 1265–67 (7th Cir.1991) (involving "an important question of labor law and policy" affecting the promulgation of new Board policy regarding the award of union backpay remedies); *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 147–48 (3d Cir.1994) (reviewing the Board's alter ego policy, "a gap-filling measure, adopted through case-by-case adjudication, to flesh out the concept of an 'employer' under the relevant provisions of the Act"). Similarly, the extent to which the subject matter invokes the special expertise of the Board is significant. *See Ferriso v. NLRB*, 125 F.3d 865, 869 (D.C.Cir.1997) (recognizing that the special expertise of the Board in matters relating to the duty of fair representation warranted "the usual measure of *Chevron* deference"); *NLRB v. Americare-New Lexington Health Care Center*, 124 F.3d 753, 756 (6th Cir.1997) (concerning the Board's electoral procedures for union certification and decertification).

 The issue we presently face is in the first instance whether the Board adopted what amounts to a "rule" here. Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "interfere with, restrain or coerce employees" in the exercise of the rights guaranteed in Section 7, including the right to engage in "concerted activities for the purpose ... of mutual aid or protection ...." 29 U.S.C. §§ 158(a)(1) & 157.[2] The Act is silent as to permissible forms of concerted activity, and neither side has directed us to any legislative history that would provide guidance in defining the limits of the term. This function falls to the Board in the first instance in the course of adjudicating conflicts between the rights of employers and employees "with as little destruction of one as is consistent with the maintenance of the other." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975 (1956).

A determination whether particular employee conduct constitutes protected concerted activity cannot be said to involve policy choices or rulemaking in the legislative sense. Unlike *IAM*, this case did not require the Board to implement a program or craft rules for translating the generalities of the statute. *See* 133 F.3d at 1015. Moreover, the subject matter does not tap into the Board's technical area of expertise to the same extent as union certification or fair representation, to mention just two examples. This is not an instance where Congress has left a gap for the Board to fill. On the contrary, the Board's reading does not create a new rule but rather rejects a commonsensical limitation on the statutory conception of "concerted activities." In fact, the Board acknowledged in oral argument that it has recognized the relevance of the means of protest when employee conduct raises safety concerns. Since the Act says nothing about safety concerns, arguably the Board's safety exception could be viewed as an affirmative, rulemaking gloss on the statute. Yet we have upheld the safety exception not specifically on the basis of *Chevron* but simply because we view it as a reasonable construc-

---

**2.** The Board also cites § 13 which provides that "[n]othing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike ...." 29 U.S.C.

§ 163. As we discuss below, this provision notwithstanding, the right to engage in concerted strike activity pursuant to Section 7 is not unlimited.

tion of the Act. *See NLRB v. Federal Security, Inc.*, 154 F.3d 751, 755 (7th Cir.1998) ("The Board adopted the ALJ's decision, which we review (as in all other administrative cases) to determine if it is supported by substantial evidence"); *East Chicago Rehabilitation Center, Inc. v. NLRB*, 710 F.2d 397 (7th Cir.1983).

In deciding that the employees were entitled to walk out over Gorrell's dismissal, the Board was engaged in the classic judicial exercise of resolving competing claims under the statute, a function which does not implicate the Supreme Court's central concerns in *Chevron.* When we review the Board's decisions, we replicate the weighing of competing claims, but, in contrast to the Board, we have consistently included the means of protest as a factor in the balance. Specifically, in concert with some other circuits, we have held that the means of protest are relevant in determining whether concerted activity over changes in supervisory personnel is protected by the Act. *See Henning & Cheadle, Inc. v. NLRB*, 522 F.2d 1050, 1055 (7th Cir. 1975); *American Art Clay Co. v. NLRB*, 328 F.2d 88, 90 (7th Cir.1964); *Yesterday's Children, Inc. v. NLRB*, 115 F.3d 36, 45 (1st Cir.1997) (citing cases); *NLRB v. Oakes Machine Corp.*, 897 F.2d 84, 89 (2d Cir.1990); *Dobbs Houses, Inc. v. NLRB*, 325 F.2d 531, 538–39 (5th Cir.1963). The nub of the Board's argument is that the Board selects the ingredients that make up the balance of competing rights and that we must accord *Chevron* deference to its recipe. From this perspective, our role is limited to reviewing whether the Board had followed its own recipe in finding concerted activity to be protected or left unprotected in a given case. But by excluding the relevancy of the means of protest, the Board's suggestion has the further consequence of tampering with the evidentiary burden itself. A finding that concerted activity is protected under the Act must be supported by substantial evidence. If employees need only establish a legitimate

reason to protest in order to secure the protection of the Act, their overall burden of production has surely been reduced from a requirement of substantial evidence to something approaching a mere scintilla.[3]

We prefer to proceed by the route of traditional deference and advance directly to review the Board's decision to determine whether is has a reasonable basis in the law. *See* 29 U.S.C. §§ 160(e) & (f); *Beverly Farm Found., Inc. v. NLRB*, 144 F.3d 1048, 1051 (7th Cir.1998) (reviewing the Board's decision that the employer had violated the Act by taking anti-union actions and declaring a premature impasse in collective bargaining negotiations); *Immel*, 102 F.3d at 951. Because we ultimately find that its reading of the Act does not withstand rational scrutiny, we decline to defer to the Board.

As a practical matter, our conclusion that the Board's interpretation of the Act is unreasonable renders moot this tussle over the standard of review; for *Chevron* deference is also premised on the reasonableness of the agency construction. Thus, even if we were to hold that the Board's decision to discount the means of protest was a policy choice governed by *Chevron*, the doctrine would not avail the Board in this case.[4] The Board misreads *Chevron* by suggesting implicitly that the Supreme Court created an irrebuttable presumption in favor of agency interpretation. Whichever the preferred standard— traditional deference or *Chevron*—the bottom line is that administrative decisionmaking must survive the test of reasonableness. Under either standard, we hold that the Board's decision does not survive.

### III.

■ Next we turn to the issue whether the Act allows employees to engage in concerted activity in protest at the termination of a supervisor. Concerted activity is generally protected under the Act provided it is

---

**3.** Of course, even under the Board's reading of the Act, employees must present substantial evidence that the disputed change in supervisory personnel relates to their terms and conditions of work. Thus, the Board's argument reduces the breadth but not the depth of the employees' burden of production.

**4.** Another way of expressing our disenchantment with the Board's interpretation is to say that it strikes us as contrary to the policies and purposes underlying the Act. *See Stardyne*, 41 F.3d at 148 (holding that the Board's alter ego analysis involved a policy choice that is consistent with the Act).

conducted "for the purpose of mutual aid and protection." 29 U.S.C. § 158(a)(1). This has been interpreted to mean that the underlying dispute must relate to the terms and conditions of work. *See NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962) (employees entitled to take concerted action over employer's failure to provide adequate heat in their place of work). Thus, the Act does not protect employees who protest a managerial action that has no bearing on such terms and conditions. Although the line between an employer's business practices and its employment practices can be difficult to draw, it is generally accepted that the hiring and firing of supervisory personnel is a managerial action unrelated to the terms and conditions of the work of non-supervisory employees. *See Henning & Cheadle*, 522 F.2d at 1054; *American Art Clay*, 328 F.2d at 90; *Yesterday's Children*, 115 F.3d at 45 ("Traditionally, the interest of the employer in selecting its own management team has been recognized and insulated from protected employee activity.") (quoting *Abilities & Goodwill, Inc. v. NLRB*, 612 F.2d 6, 8 (1st Cir.1979)); *Oakes Machine*, 897 F.2d at 89 ("Employee action seeking to influence the identity of management hierarchy is normally unprotected activity because it lies outside the sphere of legitimate employee interest.").

■ In holding that Gorrell's termination was a special case, the Board relied on a narrow but well recognized exception to the general rule: concerted activity over the firing of a supervisor is protected when the identity and capabilities of the supervisor have a direct impact on the employees' own job interests and work performance. *See Henning & Cheadle*, 522 F.2d at 1055 ("employees are entitled to the protection of the Act if they act concertedly to make known their views on [a] change in supervision to their employer"); *NLRB v. Phoenix Mut. Life Ins. Co.*, 167 F.2d 983, 988 (7th Cir. 1948); *Dobbs Houses*, 325 F.2d at 538; *Abilities & Goodwill*, 612 F.2d at 9 ("to the extent that an employee protest over a change in supervisory personnel is in fact a protest over the actual conditions of their employment, their protest would in principle be protected activity under the Act").

The facts in *Dobbs Houses*—which also involved a walkout by restaurant staff over the firing of a supervisor—are strikingly similar. The employees were fifteen waitresses who walked out during a busy Thursday night shift as well as a bartender who failed to report to work the following day. The precipitating event was the dismissal of the restaurant's assistant manager who had attempted to alleviate unpleasant working conditions, principally by acting as a buffer between the employees and the source of their angst—the restaurant manager who habitually subjected them to extreme forms of verbal abuse. The manager responded by firing the assistant manager chiefly on a hunch that the assistant manager was orchestrating a strike. On appeal, the Fifth Circuit agreed with the Board that the dismissal of the assistant manager fell within a category of exceptional cases involving legitimate employee concerns. *See Dobbs Houses*, 325 F.2d at 537–38. Nevertheless, it ultimately refused to enforce the Board's order on the ground that the waitresses' walkout was not a reasonable means of protesting their grievance over the removal of their esteemed supervisor. *See id.* at 538–39. In *Dobbs Houses*, the Board relied on the decision of this Circuit in *Phoenix Mutual*, which involved two insurance salesmen who were discharged for drafting a letter recommending that management promote the assistant cashier to the post of cashier. We held that since the salesmen would have to break in any outside candidate appointed to the post, the capability and competency of the cashier had a direct bearing on their working conditions. *See Phoenix Mutual*, 167 F.2d at 987–88.

■ The proposition that concerted activity to protest the appointment or replacement of a supervisor may be protected when the identity of the supervisor is directly related to the terms and conditions of employment has also been endorsed by some other circuits. *See Oakes Machine*, 897 F.2d at 89 (employees were entitled to complain about the company president when the president had dealt directly with the employees and had required them to spend company time working on his personal projects); *NLRB v. Sheraton Puerto Rico Corp.*, 651 F.2d 49, 51–52 (1st Cir.1981) (employee protest over hotel

general manager was not protected since it was essentially a dispute among managers and had no discernible impact on working conditions); *NLRB v. Okla–Inn*, 488 F.2d 498, 503 (10th Cir.1973) (a walkout by maids at a motel in response to a supervisor's dismissal was premised on underlying objectionable work conditions and was therefore protected).

■■■ Our cases since *Phoenix Mutual* have decided the issue of changes in supervisory personnel principally on the reasonableness of the means of protest. *See Henning & Cheadle*, 522 F.2d at 1055; *American Art Clay*, 328 F.2d at 90; *Cleaver–Brooks Mfg. Corp. v. NLRB*, 264 F.2d 637, 640 (7th Cir. 1959). We believe that this case also turns on whether the walkout was a reasonable means of protesting Gorrell's dismissal. But, as a preliminary matter, we find that there is substantial evidence to support the Board's determination that, like *Dobbs Houses*, this is one of those exceptional cases where a supervisor's dismissal affects the employees' own job interests. There is evidence that Gorrell enjoyed a special working relationship with the employees under her supervision. Repeatedly they turned to her for advice and assistance in resolving work-related complaints. Lending a sympathetic ear and umpiring coworker disputes are part of what supervisors do, but Gorrell's interventions on behalf of her subordinates were by no means routine. By repeatedly advocating the cause of individual employees, particularly with respect to complaints against other supervisory staff, Gorrell assumed an exceptional role in the employment equation.[5] In one respect, Gorrell's association with the employees was less entrenched than her counterpart in *Dobbs Houses*: there is no indication that Gorrell was out to foment a strike. But Gorrell was in effect a self-appointed mediator of employee grievances and a successful one at that. There was substantial evidence that her removal would signal a downturn in the working conditions of her charges and was therefore a legitimate employee concern.

## IV.

According to the Board, we need go no further. Having established that the employees had reason to protest Gorrell's dismissal, the Board exhorts us to enforce its order without further ado. In the proceedings below, neither the ALJ nor the Board addressed the further question whether the walkout was an appropriate means of protest, the legitimacy of the employees' grievance notwithstanding. This was not an oversight; nor was it the result of a considered determination that the walkout was reasonable in the circumstances. As the ALJ explained:

> Under Board law, the fact that the employees chose a work stoppage as the means of pressing their dispute does not negate the determination that their activity was protected. Thus, the Board has rejected the view that the protected nature of concerted activities depends on the reasonableness of the method of protest in relation to the subject matter in dispute.

325 N.L.R.B. No. 7, Case 33–CA–11389, 1997 WL 717854, at *9 (N.L.R.B. Nov.8, 1997) (citing *Puerto Rico Food Prod. Corp. v. Sindicato General De Trabajadores*, 242 N.L.R.B. 899, Cases 24–CA3864 & 24–RC–5949, 1979 WL 9159 (N.L.R.B. June 8, 1979), *enf. denied*, 619 F.2d 153 (1st Cir.1980)). When pressed in oral argument, the Board reiterated the startling and implausible contention that the means of protest are never relevant to a determination whether concerted activity is protected.

■■■ We can construe the Board's argument in two ways. From one perspective, the Board seems to be contending that employees are entitled to take any imaginable form of concerted action—presumably short of committing a crime—as long as their grievance relates to their terms and conditions of work. This, however, runs counter to the objectives of industrial harmony on which the National Labor Relations Act rests and the conventional wisdom that preserves strike activity as a measure of last resort. It

---

5. In oral argument, Bob Evans emphasized the social dimension of Gorrell's relationship with the employees. However, we agree with the Board that this factor adds nothing to the discussion of Gorrell's impact on the employees' working conditions. *See Puerto Rico Food Prod. Corp. v. NLRB*, 619 F.2d 153, 156 (1st Cir.1980) (evidence that supervisor befriended employees and cautioned them about visible union activity was irrelevant).

belies common sense to suggest that employees are at liberty to resort to the most disruptive form of industrial action to protest even a trivial grievance over working conditions. In the specific context of this case, the logical inference of the Board's argument is that a walkout is necessarily an appropriate means of protesting the discharge of a supervisor. A walkout is a species of strike and as such is generally protected provided it is conducted for the purpose of mutual aid and protection. See 29 U.S.C. § 158(a)(1); *Federal Security*, 154 F.3d at 755. Whether such an immoderate form of protest is justified when the grievance relates to the identity of supervisory personnel is another matter. In *Phoenix Mutual*, we endorsed the more modest approach of writing a letter of complaint. *See* 167 F.2d at 988; *see also Oakes Machine*, 897 F.2d at 89; *Sheraton Puerto Rico*, 651 F.2d at 53; *NLRB v. Guernsey–Muskingum Elec. Co-operative, Inc.*, 285 F.2d 8, 12–13 (6th Cir.1960) (simple voicing of complaint over appointment of foreman was protected activity). In *Cleaver–Brooks*, we held that four employees who instigated a boisterous work stoppage over a change in foreman were not engaged in protected activity since they failed to act with the moderation of their counterparts in *Phoenix Mutual*. *See* 264 F.2d at 640. Similarly, in *American Art Clay*—which also involved a walkout in response to a change in foreman—we opined that *Phoenix Mutual* was not a proper basis for the Board's decision in *Dobbs Houses* since the two cases were easily distinguished by reference to the means of protest. *See* 328 F.2d at 90. The reasonableness of the employees' response was also the deciding factor in *Henning & Cheadle*: we held that a campaign of calling in sick in the face of an important departmental deadline went beyond the protection of the Act. *See* 522 F.2d at 1055; *see also Abilities & Goodwill*, 612 F.2d at 11 (employees' "sickout" not protected). We do not interpret this case law as condemning walkouts generically in this context. However, there is apparently no reported instance of a work stoppage sufficiently tempered to win court approval.[6]

The Board may also be contending that in circumstances where a strike is an appropriate means of protest, the Act places no restraint on the nature, extent and timing of employee conduct. According to this view, the Bob Evans employees were entitled not only to strike over Gorrell's dismissal but to do so in a manner entirely of their own choosing. The Board's suggestion is contradicted by its own case law which recognizes that the right to walk off the job for the purpose of mutual aid or protection is not unlimited. There are established exceptions to the general rule that a work stoppage constitutes protected activity. We have already noted the exception with regard to strike activity that threatens the health or safety of others. *See Federal Security*, 154 F.3d at 755; *East Chicago Rehabilitation*, 710 F.2d at 404.[7] Safety exceptions aside, the Board is essentially suggesting that employees are under no general duty to minimize disruption. This has a common sense attraction insofar as disruption is the essence of industrial action—the source of economic pain that gives employees tangible leverage. *See East Chicago Rehabilitation*, 710 F.2d at 404 ("The whole purpose of a strike is to impose costs on the employer, in the hope of making him come to terms."). But the right to disrupt is not unbridled and is tempered by an inherent proportionality requirement. Common sense dictates that an employer cannot object to a strike on grounds of mere inconvenience but that, at the other extreme, employees cannot run an employer out of business solely to make known a minor grievance. *See Phoenix Mutual*, 167 F.2d at 988 (moderate conduct of insurance salesmen in writing a letter of protest bore "a reasonable relation to conditions of their employment");

---

6. At first blush, *Okla–Inn* appears to be such an instance. The Tenth Circuit held that a walkout in protest over the dismissal of a supervisor was protected. However, the Court concluded that the employees were also protesting their own intolerable working conditions; while the supervisor's dismissal triggered the walkout, it was not the sole source of dispute. Thus, in determining that a walkout was a reasonable form of protest, the Court had in mind the totality of the employees' grievances. *See* 488 F.2d at 503.

7. Employees may also lose the protection of the Act by engaging in a walkout that poses a foreseeable risk of damage to their employer's plant and equipment. *See Columbia Portland Cement Co. v. NLRB*, 915 F.2d 253, 258 (6th Cir.1990) (citing cases).

*Abilities & Goodwill*, 612 F.2d at 11 (grievances over the firing of a supervisor had not "reached the point" where extreme measures of concertedly calling in sick and threatening a strike were justified).

■■■■■ In summary, we reject the Board's contention that concerted activities can take any form and reassert the approach adopted by the majority of the courts which have confronted the issue, namely, that the reasonableness of the means of protest is one of a variety of factors that are examined in order to determine whether employee activity is protected. *See Abilities & Goodwill*, 612 F.2d at 9 ("By thus examining both the substantive interest and the means of advancing it, courts have balanced more finely the competing interests involved."). In view of the wide disparity between grievance and means of protest in the present case, there is no reason to explore to what extent in principle a strike is a proper response to this kind of grievance. For present purposes, it is enough to reiterate that the Act does not protect employees who protest a legitimate grievance by recourse to unduly and disproportionately disruptive or intemperate means.

■■■■■ Ordinarily we would remand this issue to the Board for a determination whether this walkout was a reasonable means of protesting Gorrell's dismissal. But we believe that remand would be superfluous in this case. When they walked out of the restaurant *en masse* at the start of a busy Friday evening shift, Gorrell's underlings surely strayed into the realm of unprotected activity. The walkout had the immediate effect of crippling the restaurant's ability to function at what was characteristically a particularly busy time. The employees must have been aware of the consequences that were likely to flow from their actions and could have resorted to less disruptive forms of concerted action in order to register their dissatisfaction over Gorrell's dismissal.[8] The Board contends that we must take account of Bob Evans's actions in assessing the reasonableness of the employees' conduct. It points out that the employees in *Dobbs Houses* were expressly asked to abandon their walkout and return to work whereas Bob Evans called in the police to evict the employees from the premises. But in oral argument, the Board conceded the absence of evidence that the employees were willing to resume their posts on the evening of the walkout. We believe that this case is on all-fours with *Dobbs Houses*. In short, the Bob Evans employees acted with the intemperance of the waitresses in *Dobbs Houses* and without the restraint exercised by the salesmen in *Phoenix Mutual*. The other relevant case law points in the same direction. There is substantial evidence to suggest that their unduly disruptive walkout bore no reasonable relation to their grievance and necessarily lost them the protection of the Act.[9]

ENFORCEMENT DENIED.

---

8. The Board does not point to any evidence in the record that would support its depiction of these employees as unsophisticated individuals who could not appreciate the probable consequences of their actions. But the Board proceeds on this assumption, and perhaps this understanding underlies its indifference to means in these circumstances. Perhaps, the Board believes a walkout is an understandable reaction—possibly the only understandable reaction—to the grievance here. But understandable or not, we cannot recognize the disruptive employee reaction as legitimate.

9. There is one outstanding matter that is easily disposed of. Bob Evans also argues that the walkout was not protected because the employees failed to articulate any objectives to which it could respond. Employees do not necessarily lose the right to engage in concerted activities merely because they do not present a specific demand. *See Washington Aluminum*, 370 U.S. at 14 ("The language of § 7 is broad enough to protect concerted activities whether they take place before, after, or at the same time such a demand is made."). In any event, there is substantial evidence to support the Board's determination that Bob Evans's own actions—notably Dunlap's rush to call in the police and Ward's inflexible stance—likely hindered the ability of the employees to engage in demand and dialogue.